**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JEREMIAH KELLY                          :
                                        :
v.                                      :    Civil No. WMN-06-0702
                                        :
LEONARD HAMM <u>et al.</u>              :
                                        :
                                        :

<u>**MEMORANDUM**</u>

Before the Court is the Motion to Enforce Settlement filed

under temporary seal[1] by Plaintiff, Jeremiah Kelly, Paper No. 37,

and the Motion to Reopen filed by Defendants, Police Commissioner

Leonard Hamm, Colonel Walter Tuffy, and Chief Edward Ambrose.

Paper No. 38.[2]  Upon a review of the pleadings and applicable

---

[1]Pursuant to Local Rule 105.11, if a party moves to seal materials filed with the Court, the materials remain under temporary seal pending the Court's ruling.  A motion to seal shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections. Local Rule 105.11.
   Plaintiff's motion to seal states that settlement negotiations are recognized as "confidential," that he must rely on a "confidential letter from Judge Bredar to counsel" and that he must rely on "sensitive personal and financial data." Plaintiff does not offer any explanation why alternatives to sealing, such as redaction, would not provide sufficient protection.
   The Court will grant the motion to seal as to Judge Bredar's letter, Paper No. 37, Ex. 1, and as to Plaintiffs' financial documents, Paper No. 37, Ex. 30.  Except for those exhibits, the motion to seal is denied for failure to comply with Local Rule 105.11.  Plaintiff may, within 15 days, renew his motion in compliance with Rule 105.11 or withdraw or file redacted versions of materials currently under seal.  The additional materials now under temporary seal will remain so until the renewed motion, if filed, is ruled upon.  If no motion is filed, the remaining materials will no longer be kept under seal.

[2]BPD filed an opposition to the motion to enforce that simply incorporated by reference the previously filed motion to reopen.  Similarly, Kelly's opposition to the motion to reopen incorporated his reply brief with respect to the motion to

case law, the Court determines that no hearing is necessary
(Local Rule 105.6) and that Plaintiff's Motion to Enforce will be
granted and Defendants' Motion to Reopen will be denied.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The pertinent facts are as follows.  Plaintiff was
terminated from his position as a sergeant in the Baltimore City
Police Department ("BPD") due to his alleged involvement in
approving a false police report made by a subordinate police
officer.  Kelly appealed his termination and eventually was
ordered reinstated to the rank of sergeant by the Maryland Court
of Special Appeals.  Shortly after the issuance of the order for
reinstatement, Kelly was indicted on federal criminal charges
and, consequently, the BPD suspended him without pay.  In July of
2005, Kelly was acquitted of all criminal charges and thereafter
began receiving pay at the rate of sergeant.

On March 16, 2006, Kelly brought the instant action against
Commissioner Hamm, Police Chief Ambrose, and the Director of
Internal Affairs, Tuffy, (collectively BPD) alleging violations
of state and federal due process and equal protection rights and
unlawful retaliation following his return to BPD.  On October 25,
2006, this Court granted BPD's motion to dismiss the complaint as
to all but the equal protection count.  Paper No. 13.  Kelly's
equal protection claim alleged that he was treated differently

---

enforce.  Accordingly, for purposes of this opinion, the Court
will treat the motion to reopen as an opposition to Kelly's
motion to enforce (and will refer to it as such) rather than
addressing the two motions separately.

2

from other officers returning to BPD from an extended hiatus.

On March 30, 2007, the Court referred the case to a magistrate judge for a settlement conference.  On April 30, 2007, the parties attended a settlement conference before Magistrate Judge James K. Bredar.  The following day, Judge Bredar sent a letter to the parties stating that an "agreement was reached" and setting forth the terms of the agreement, which were, in pertinent part: that Kelly would retire from BPD no later than five years from the date of the agreement (April 30); that the City of Baltimore would pay Kelly a monetary award; that upon retirement, Kelly would receive a pension "in compliance with the Rules and Regulations for Fire and Police Pensions," the amount of such benefit to be "a function of the balance in the plaintiff's pension account," with the understanding that Kelly could deposit the above referenced monetary award into his pension account; and that Kelly would retire "as a sergeant in good standing."  Mot. To Enforce, Ex. 1 (Settlement Letter) at ¶¶ 1-3, 5.

That same day, the Court entered a settlement order pursuant to Local Rule 111 dismissing the case without prejudice.  Paper No. 29.  Almost three months later, on August 25, 2007, a settlement having not yet been consummated, Kelly moved to enforce the settlement.  BPD responded by moving to reopen the case, asserting that the settlement could not be consummated because of legal impediments unknown to the parties at the time

they entered into the "proposed settlement."[3]

## II. STANDARD OF LAW

It is well established that a court has jurisdiction to enforce a settlement agreement entered into by parties in a case currently pending before it.  See Wood v. Virginia Hauling Co. 528 F.2d 423, 425 (4th Cir. 1975) ("A United States district court has inherent power to supervise and aid the implementation of settlement agreements in pending litigation.").  A court can only enforce a settlement once it has concluded that "a complete settlement has been reached and determines the terms and conditions of that agreement."  Hensley v. Alcon Labs., Inc., 277 F.3d 535, 540 (4th Cir. 2002) (citing Ozyagcilar v. Davis, 701 F.2d 306, 308 (4th Cir. 1983)).

Summary enforcement is permissible where the terms of the agreement can be determined and "the excuse for nonperformance of the agreement is 'comparatively insubstantial.'"  Id. (quoting Millner v. Norfolk & W. Ry. Co., 643 F.2d 1005, 1009 (4th Cir. 1981)); See also Petty v. Timkin Corp., 849 F.2d 130, 132 (4th Cir. 1988)("Trial courts possess the inherent authority to

---

[3]Local Rule 111 provides, in pertinent part, that an order of dismissal entered after notification that the parties have settled "shall be without prejudice to the right of a party to move for good cause to reopen the case within a time set by the Court."  The Court's May 1, 2007, order of dismissal provided that the dismissal would convert to a dismissal with prejudice within sixty days (June 30).  Paper No. 29.  The parties twice jointly moved to extend this time period by 30 days, thus the deadline for filing a motion to reopen was extended until August 30, 2007.  Papers No. 30, 32.

enforce a settlement agreement and to enter judgment based on an agreement without a plenary hearing."). Where a material factual dispute as to the terms exists, a court may not summarily enforce the agreement, but rather must "'conduct a plenary evidentiary hearing in order to resolve that dispute' and make findings on the issues in dispute[.]" Hensley, 277 F.3d at 541 (quoting Millner, 643 F.2d at 1009) (internal citation omitted).

## III. DISCUSSION

### A. Existence of a Complete Settlement Agreement

In determining whether a complete settlement was reached in the instant action, the Court draws on standard contract principles. See Hensley, 277 F.3d at 540. Under Maryland contract law[4], the initial inquiry thus concerns whether there was "a meeting of the minds" at the April 30, 2007, mediation and settlement conference before Judge Bredar. See, e.g., Cochran v. Norkunas, 919 A.2d 700, 713 (Md. 2007)("common to all manifestations of acceptance is a demonstration that the parties had an actual meeting of the minds regarding contract formation").

The Court concludes quite easily that a complete settlement agreement was reached, as memorialized in the Settlement Letter

---

[4]The Court may look to the law of the forum state for well-established contract principles. See Sadighi v. Daghighfekr, 66 F. Supp. 2d. 752, 759 n.2 (D.S.C. 1999)(discussing the discretion of the district court to look to the law of the forum state to give "some content to federal common law" in the context of enforcing a settlement agreement in a case involving both federal and state law claims).

to the parties.  The letter itself states unequivocally that "an agreement was reached."  Following receipt of the letter, neither party challenged or sought to clarify any of the terms set forth therein.  Rather, ten days after the settlement conference, counsel for BPD sent a draft settlement agreement to Kelly, which incorporated by reference the terms in the Settlement Letter. See Mot., Ex. 2.  Thereafter, counsel for Kelly corresponded with BPD regarding the "mechanics" of repurchase of pension credits as contemplated under the agreement.  Thus, the parties' actions subsequent to the settlement conference manifested their mutual understanding that agreement had been reached and that consummation of the settlement was all that remained.

Moreover, the Court notes that, while BPD refers to the contents of the Settlement Letter as the "proposed terms" throughout its opposition, it does not argue that agreement was not reached at the April 30, 2007, settlement conference. Rather, BPD argues that events subsequent to the settlement conference render the agreement unenforceable and that settlement cannot be consummated pursuant to the Settlement Letter for reasons that the Court will discuss, infra.  See Opp'n at 2 (stating that Judge Bredar's letter set forth the "fourteen points on which the parties agreed during mediation")(emphasis added).  Accordingly, on this threshold issue, the Court concludes that there was a meeting of the minds at the settlement conference.

**B. The Terms of the Settlement**

In addition to the determination that an agreement was reached, the Court also must be able to determine the terms of the agreement in order to enforce settlement summarily.  See Hensley, 277 F.3d at 540-41.  In the instant case, the parties essentially agree that the Settlement Letter set forth the agreed terms.  BPD contends, however, that subsequent to the initial agreement, Kelly "demanded altered or additional terms."  Opp'n at 5 n.1.[5]  As a result, BPD appears to argue that the agreement was repudiated or modified, rendering it unenforceable.  Kelly replies that he "at all times demanded compliance" with the agreement.  Moreover, Kelly argues that his willingness to negotiate with BPD to overcome obstacles to consummation of settlement does not excuse non-performance on the part of BPD.

## 1. Altered Terms

The draft settlement document sent to counsel for Kelly by BPD shortly after the settlement conference contained a release

---

[5]BPD relegates to a footnote its argument that "[t]here can be no dispute that the parties did not enter into an enforceable settlement agreement" because of the purportedly "altered or additional terms" and because the parties were unable to "agree to the form of a settlement agreement document."  BPD cites no legal authority for either contention, nor does it even point to the "altered or additional terms" it asserts that Kelly demanded.  Accordingly, the Court is forced to guess, based on BPD's recitation of the facts, the terms to which it refers.

As to BPD's contention that failure to agree to a settlement document renders the terms in the Settlement Letter unenforceable, the Court concludes that this argument is without merit.  See Hensley, 277 F.3d at 540 (noting that the "fact that the [settlement] agreement is not in writing does not render it unenforceable"); See also United States v. Centex Simpson Constr. Co., Inc., 34 F. Supp. 2d 397, 399-400 (N.D.W. Va. 1999) (failure to sign formal settlement papers does not mean that settlement was not reached).

clause that Kelly believed to be broader than the release agreed
to and set forth in the Settlement Letter.  <u>See</u> Mot., Ex. 5
(email from counsel for Kelly stating that the "release language"
in the draft settlement document "releases claims prospectively
into the future and that is not what is reflected in [settlement
discussions] nor will it ever be agreeable with Mr. Kelly").  BPD
suggests that Kelly sought to alter the release term in the
settlement agreement.  While a disagreement certainly arose as to
the release language in the settlement agreement drafted by BPD,
the disagreement concerned whether BPD's language conformed to
the terms of the Settlement Letter or expanded upon them.  There
is no indication that Kelly repudiated the settlement agreement
by challenging the language used by BPD in its draft settlement
document.

### 2. Additional Terms

The "additional" terms that BPD asserts were "demanded" by
Kelly involve the pension provision in the Settlement Letter,
which provided:

> Upon the plaintiff's retirement, the plaintiff will be
> paid a pension in compliance with the Rules and
> Regulations for Fire and Police Pensions in the City of
> Baltimore.  The parties acknowledge that the pension
> benefit will, in part, be a function of the balance in
> the plaintiff's pension account.  The plaintiff may
> elect to deposit the above [referenced monetary award]
> into his pension account.

Settlement Letter, ¶ 3.  As discussed, <u>supra</u>, the Settlement
Letter further provided that Kelly would retire no later than
five years from the date of the agreement and that he would
retire at the rank of sergeant.  Settlement Letter, ¶¶ 1, 5.

8

Shortly after the settlement conference, on May 18, 2007, counsel for Kelly wrote to BPD "with respect to the tentative settlement agreement" to inquire as to how Kelly would go about "repurchas[ing] previous service" for purposes of his pension benefit with the Baltimore City Fire and Police Pension Board (F&P).  Mot., Ex. 3.  The letter explained that, at the time of Kelly's initial termination from the BPD, his pension had not yet vested and he chose to withdraw the money from his account.  The letter further stated, "[a]s you know, the settlement was predicated upon correcting Sgt. Kelly's pension benefits (i.e., the City would pay [a monetary award] and Sgt. Kelly would pay the difference, in order for Sgt. Kelly to obtain pension benefits as if he had not been wrongfully terminated back in 2001)."  Id.

Counsel for the parties exchanged numerous emails, wrote letters back and forth, and held a teleconference with Judge Bredar to try to resolve the issue.  In the May 31, 2007, teleconference with Judge Bredar, BPD represented that the repurchase of F&P pension benefits would be arranged and Judge Bredar instructed counsel for BPD to obtain a letter from the Executive Director of F&P, Thomas Taneyhill, to this effect. Hoffman Aff. ¶ 2.

On June 11, 2007, counsel for BPD forwarded to Kelly the requested letter, but it was unsigned and was not on F&P letterhead.  Mot., Ex. 11 (Taneyhill letter).  The letter was addressed to counsel for Kelly and stated, in pertinent part,

"[t]his letter serves to confirm that, pursuant to the settlement of the above-referenced litigation, the City of Baltimore shall permit your client, Sgt. Jeremiah Kelly, to purchase his years of missing service in the [F&P] System."  Id.  An executed version of the Taneyhill letter was supposed to follow the next day, but did not.

BPD suggests that Kelly's "insist[ence]" in the May 31, 2007, telephone conference with Judge Bredar that BPD produce the Taneyhill letter represented an additional term not contemplated by the parties.  Opp'n at 2.  This argument fails because repurchase of service credits clearly was contemplated by the parties.  The Settlement Letter specifically states that Kelly could deposit the monetary award from BPD into his pension account.[6]  Settlement Letter ¶ 3.  In light of F&P's apparent unwillingness to assist him, Kelly sought assurances of performance from BPD.  Cf. Restatement (Second) of Contracts § 251(1) ("[w]here reasonable grounds arise to believe that the obligor will commit a breach by non-performance . . . the obligee may demand adequate assurance of due performance . . .").  The Taneyhill letter - which the Court notes was never provided to Kelly in anything but draft form - was meant to be such an assurance.

The second "additional term" to which BPD apparently refers relates to Kelly's entitlement to participate in the F&P system

_____

[6]The Court also notes that BPD never disputed Kelly's representation in the May 18, 2007, letter that the settlement was "predicated upon correcting Sgt. Kelly's pension benefits[.]"

during the five years preceding his retirement.  According to
BPD, in the course of preparing the Taneyhill letter, F&P
conducted its own evaluation of Kelly's eligibility to
participate in the pension plan.  In the course of that
evaluation, it came to the attention of counsel for F&P that
Kelly's certification with the Maryland Police and Correctional
Training Commission (MPCTC) had lapsed.  On June 13, 2007, in a
telephone conference, counsel for BPD informed counsel for Kelly
that the lapsed certification apparently made Kelly ineligible to
continue to participate in F&P.  Hoffman Aff. ¶ 3.  Thereafter,
on June 26, 2007, a second telephone conference with Judge Bredar
was held.  Judge Bredar recommended that BPD seek recertification
of Kelly with the MPCTC "in exchange for [Kelly]'s agreement that
he not exercise police powers or transfer to another police
jurisdiction in order to do so."  Id. ¶ 4.

    BPD suggests that seeking provisional recertification of
Kelly with the MPCTC was an "additional term" not contemplated by
the parties.[7]  To be sure, the Settlement Letter made no
reference to recertification of Kelly with the MPCTC.  This is so
because, while the parties were aware that Kelly's certification
had lapsed, there had been no prior indication that certification
was a prerequisite to participation in the F&P system.[8]  In any

---

[7]It is unclear whether BPD ever submitted an application for
provisional recertification of Kelly to the MPCTC.  BPD now
contends that recertification would not be possible.  Kelly
disputes this contention.

[8]The Court will discuss this requirement in more detail,
infra.

event, the parties never reached a meeting of the minds as to the
issue of recertification - as is apparent from extensive
correspondence exchanged on this issue between counsel for the
parties both before and after the second conference call with
Judge Bredar.  <u>See, e.g.</u>, Mot., Ex. 26 (August 3, 2007, letter
from counsel for BPD stating that Kelly must pass a mental health
exam to qualify for even a provisional recertification with
MPCTC); Mot., Ex. 27 (August 5, 2007, email from counsel for
Kelly rejecting the suggestion that Kelly would have to pass a
new mental health exam as contrary to their prior discussions).
Accordingly, the Court concludes that the fact that the parties
attempted to negotiate around this issue in order to consummate
settlement did not modify the terms of the Settlement Letter or
render the terms unenforceable.

### C. Enforcement of the Settlement Agreement

Kelly urges this Court to summarily enforce the settlement
agreement as written or, in the alternative, to hold an
evidentiary hearing to determine the present value of the
settlement agreement and award Kelly its value.  Mot. at 23.  BPD
responds that it entered into the agreement based upon the "good
faith, but erroneous belief that [Kelly] was eligible to continue
to participate in [F&P]."  Opp'n at ¶ 5.  Since BPD cannot comply
with the terms of the settlement due to legal impediments unknown
to them at the time of entering into the agreement, the
settlement cannot be approved by the Baltimore City Board of
Estimates and accordingly cannot be enforced by the Court.  <u>Id.</u>

at ¶¶ 5-6.  As such, BPD contends that good cause exists to
reopen the case pursuant to Local Rule 111.[9]

As discussed above, BPD asserts that Kelly's lapsed MPCTC
certification prevents him from participating in the F&P system
as a matter of law.  Pursuant to Maryland law, an individual "may
not serve as a police officer when the certification of the
police officer has lapsed[.]"  Md. Code Ann., Pub. Saf., § 3-217.
It is undisputed that Kelly's certification has lapsed given his
extended absence from the BPD.  See id. § 3-210(a)("certification
of a police officer automatically lapses 3 years after the date
of the previous certification").  Moreover, it is undisputed that
the parties to this case were aware that Kelly's certification
had lapsed prior to entering into settlement discussions in that
BPD's alleged refusal to apply for recertification of Kelly was
central to Kelly's complaint in this action.  See, e.g., Compl. ¶
21; See also Mot. to Dismiss at 9.  Thus, it is apparent that BPD
knowingly negotiated a settlement with Kelly that involved him

_____

[9]BPD asserts that the only issue before this Court is
whether "good cause" exists.  BPD treats this "good cause"
determination as independent from any analysis of whether the
parties entered into an enforceable settlement agreement.  The
cases cited by BPD are not on point and do not support this
contention.  See McNeal v. Aetna Cas. and Sur. Co. of Ill., No.
97-2004, 1998 WL 746886 *2 (4th Cir. 1998) (denying motion to
reopen for lack of good cause where a party sought to avoid a
binding appraisal award); H & W Fresh Seafoods, Inc. V. Schulman,
200 F.R.D. 248, 251 (D. Md. 2000) (noting in the recitation of
facts that a motion to reopen the case pursuant to Local Rule 111
had been granted when a party ceased making required payments
under the settlement agreement); District of Columbia Chamber of
Commerce, Inc. V. Universal Bank, No. 87-3267, 1990 WL 159931 *1
(D. Md. 1990) (noting in the recitation of facts that a motion to
reopen previously was granted due to "unresolved third party
claims").

being treated as a sergeant, maintaining his position in the
department, and retiring as a sergeant with his pension despite
the fact that his certification had lapsed.  These are the terms
upon which the Court already has concluded there was a meeting of
the minds.

F&P was not a party to the settlement, however, and did not
agree to its terms.  When Kelly's lapsed certification came to
attention of counsel for F&P, Abraham Schwartz, he informed
counsel for BPD that F&P was unwilling to participate in "a
settlement that would continue [Kelly's] membership, because
[F&P] believe they are prohibited from doing so."  Mot., Ex. 16
(June 14, 2007, email from counsel for BPD to counsel for Kelly).
This was because Mr. Schwartz was of the opinion that, in order
to be exempted from FICA (and thus eligible for F&P), an employee
had to occupy a "policeman's position" and only those employees
possessing the "power of arrest" fell within that category.
Since, by virtue of his lapsed certification, Kelly could not
exercise the power of arrest, he also was not eligible for F&P.

In support of its position, F&P provided to BPD a 1996
opinion letter written to the BPD Human Resources Department
Chief from Mr. Schwartz in response to the question whether
"certain officers of the Police Department who have had their
police powers indefinitely or permanently suspended become
ineligible for continue membership in [F&P]."  <u>Id.</u>  Mr. Schwartz
looked to the Baltimore City Code, defining the term "employee"
for purposes of the F&P to include "any officer or employee of .

14

. . the Police Department," except that it excluded "any officer
or employee . . . for whose benefit the Mayor and City Council of
Baltimore makes contributions as required under the Social
Security System[.]"  See Baltimore City Code, Art. 22, § 30.2(a)
(1966 ed., as amended).[10]  The letter further stated that, in
July of 1958, the City entered into an agreement with the State
of Maryland "which brought all City employees into the Social
Security System with the exception of an employee in a
policeman's or fireman's position."  Mot., Ex. 15 (internal
quotations omitted).  Relying on two Maryland Attorney General
opinions, one from 1955 and one from 1967, interpreting the term
"policeman's position," Mr. Schwartz concluded that an employee
must be "regularly engaged in enforcing and preserving the public
peace" in order to qualify as a policeman and be exempt from
FICA.  Id. (quoting 40 Op. of the Md. Att. Gen. 420, 422-23
(1955)).

While Kelly treats BPD's argument as one of legal
impossibility excusing performance, see Mot. at 15-22, the Court
concludes that BPD's argument is more properly construed as
voidness for illegality.[11]  In other words, the settlement was

---

[10]The current version of this provision is substantively
unchanged.

[11]Kelly asserts, correctly, that a legal impossibility
argument fails because there has been no supervening change in
the law.  See, e.g. Harford County v. Town of Bel Air, 704 A.2d
421, 431 (Md. 1998) ("[i]f a contract is legal when made, and no
fault on the part of the promisor exists, the promisor has no
liability for failing to perform the promised act, after the law
itself subsequently forbids or prevents the performance of the
promise") (internal citation omitted).

illegal at the time the parties entered into their agreement.
Kelly argues that his participation in F&P is not barred by law.
See 20 C.F.R. § 404.1212 (2007) (defining "police officers" for
FICA purposes without reference to any particular powers which
must be exercised).  Kelly also points out that, after his
reinstatement in 2005, he was allowed to contribute to F&P and
that BPD made no FICA contributions on his behalf despite his
lapsed certification.  Finally, Kelly notes that Mr. Schwartz's
1996 opinion letter ended with the statement that, regardless of
the opinions expressed therein, the "determination of an
officer's FICA exemption is primarily within the province of the
City Solicitor's office, and ultimately, the State of Maryland
Attorney General and the Social Security Administration."  Mot.,
Ex. 15.

        Under Maryland law, a contract is illegal if "either the
formation or the performance thereof is prohibited by
constitution or statute."  Thorpe v. Carte, 250 A.2d 618 (Md.
1969).  Maryland courts are less likely to void contracts for
illegality, however, where the legislature did not expressly
state that contracts in contravention of the law would be void.
See, e.g., Springlake Corp. v. Symmarron Ltd. P'ship, 569 A.2d
715, 718-19 (Md. Ct. Spec. App. 1990) (where no explicit
legislative intent to void contracts made contrary to a statutory
provision exists, court must balance private interest in
enforcement versus public policy interest against enforcement).
Here, where the authority cited is the Baltimore City Code and

decades old Maryland Attorney General opinions, this Court is
unwilling to find a settlement agreement void for illegality.
This result is supported by the fact that BPD was in a far
superior position to know the legality <u>vel non</u> of the pension
provision of the settlement agreement given that the 1996 opinion
letter had been requested by a member of BPD.  As such, Kelly was
justified in relying on BPD's superior knowledge.  <u>Cf.</u>
Restatement (Second) of Contracts § 180 (where the promisee is
"excusably ignorant of facts or of legislation of a minor
character" affecting the enforceability of a contract and the
promisor is not "excusably ignorant" of the same facts or
legislation, the promisee may maintain an action for breach).

        The Court also is wary, however, of ordering BPD to
consummate settlement given the F&P's legal concerns.
Accordingly, without deciding whether or not the BPD could
consummate the settlement agreement if so ordered by this Court,
the Court finds that enforcement of the settlement agreement may
be more appropriately accomplished by reducing the current value
of the settlement to a sum certain to be awarded to Kelly.  <u>See</u>
<u>Woods</u>, 528 F.2d at 425 (stating that where a settlement agreement
may be translated "into terms of dollars and cents," it is well
within the power of a district court to do so).  This equitable
remedy will afford Kelly the benefit of the bargain he entered
into with the BPD, but will not force BPD to perform acts it
believes to be contrary to law or regulation.  The Court further
concludes that the scheduling of a plenary evidentiary hearing is

unnecessary at this time.  Rather, the parties will be ordered to brief the Court on the issue of the value of the settlement agreement.

## IV.  CONCLUSION

For all of the above stated reasons, Plaintiff's motion to enforce settlement will be granted and enforcement will be accomplished by means of reducing the settlement agreement to a sum certain.  A separate order consistent with the reasoning of this Memorandum will follow.

```
              /s/
William M. Nickerson
Senior United States District Judge
```

Dated: November 16, 2007